Exhibit "A"

# Independent ▪
# Film & Television
# ▪ ▪ ▪ Alliance
# Arbitration®

10850 Wilshire Boulevard / 9th Floor
Los Angeles, CA 90024-4321
310-446-1000 TEL / 310-446-1600 FAX
www.ifta-online.org / info@ifta-online.org

March 21, 2013

Daniell K. Newman, Esq.
Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
    Via email: newmandk@gtlaw.com and certified mail

L. Londell McMillan, Esq.
Kevin Fritz, Esq.
Meister Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, NY 10017
    Via email: llm@msf-law.com; kaf@msf-law.com and certified mail

**Re:    Arbitration #12-50 – BroadcastUrban FilmWorks, LLC v. Loida Nicolas Lewis**

Gentlepersons:

In accordance with Paragraph 12.3 of the applicable IFTA Rules for International Arbitration, enclosed is a fully executed Final Arbitration Award rendered in this matter.

This Award is being forwarded to the Parties via email, with an original to follow via USPS certified mail. If you would like to receive the Award via courier, please provide IFTA with your courier account number no later than close of next business day from the date of this letter.

Sincerely,
IFTA

Richonda Starkey
Arbitral Agent

enclosures by certified mail

cc:    Michael L. Novicoff, Esq., Arbitrator – 310-500-3501 w/o attachments
       Kim Tommaselli, Senior Counsel, IFTA
       Susan Cleary, Vice President & General Counsel, IFTA

# DECLARATION OF SERVICE

I, Richonda Starkey, declare as follows:

I act as Arbitral Agent for IFTA Arbitration in Los Angeles, California. I am over the age of eighteen years of age and am not a party to this action. IFTA's address is 10850 Wilshire Boulevard, 9th Floor, Los Angeles, CA 90024. On March 21, 2013, I served the **Final Arbitration Award** on the interested parties as follows:

☒         **BY REGISTERED AND/OR CERTIFIED MAIL:** I placed a true copy in a sealed envelope addressed the party/ies indicated at the address(es) below. The envelope is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party serviced, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day after date of deposit for mailing in affidavit.

☐         **BY COURIER/OVERNIGHT SERVICE:** I caused DHL Express or Federal Express to deliver a true copy of the aforementioned document(s) in a sealed envelope with airbill addressed to the party/ies indicated at the address(es) shown below.

☐         **BY FACSIMILE:** I caused the aforementioned document to be transmitted by facsimile machine to the parties and numbers indicated below. The transmissions were reported as complete, and no errors were reported by the facsimile machine. Copies of the transmission records are maintained by our office.

☐         **BY PERSONAL SERVICE:** I caused Express Group, Inc. to hand deliver a true copy of the aforementioned document(s) in a sealed envelope addressed to each person(s) named at the address(es) shown below.

☒         **BY ELECTRONIC MAIL (.PDF FORMAT):** I caused a true copy of the aforementioned document(s) to be sent via e-mail (.pdf format) to the interested party/ies at the e-mail address/es indicated below.

Executed on March 21, 2013 at Los Angeles, California.

☒         **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

*Richonda Starkey*
**RICHONDA STARKEY**
**Arbitral Agent**
**IFTA Arbitration**

# SERVICE LIST

Daniell K. Newman, Esq.
Greenberg Traurig, LLP
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

newmandk@gtlaw.com

L. Londell McMillan, Esq.
Kevin Fritz, Esq.
Meister Seelig & Fein LLP
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, NY 10017

llm@msf-law.com
kaf@msf-law.com

1 | Michael L. Novicoff, Arbitrator
  | IFTA INTERNATIONAL ARBITRATION TRIBUNAL
2 | 1100 Glendon Avenue, 14th Floor
  | Los Angeles, California 90024-3503
3 | Telephone: (310) 500-3500
  | Facsimile: (310) 500-3501
4 | E-Mail: mnovicoff@linerlaw.com

5

6

7

8          **INDEPENDENT FILM AND TELEVISION ALLIANCE**

9          **INTERNATIONAL ARBITRATION TRIBUNAL**

10

11 | BROADCASTURBAN FILMWORKS, LLC,     ) Case No. 12-50
                                       )
12 |              Claimant,            ) **FINAL ARBITRATION AWARD**
   |         vs.                       )
13 |                                   )
   | LOIDA NICOLAS LEWIS,              )
14 |                                   )
   |              Respondent.          )
15 |                                   )
   |                                   )
16 |                                   )
   | AND RELATED COUNTERCLAIMS.        )
17 |                                   )

18      On January 13, 2013, the Arbitrator issued the Interim Arbitration Award ("Interim

19 Award") that is attached to this Final Arbitration Award as Exhibit A. That Interim Award was

20 intended to, and did, fully and finally resolve the merits of the dispute between the parties to this

21 proceeding. The text of the Interim Award is incorporated into this Final Arbitration Award by this

22 reference as though set forth in full at this point.

23      In the Interim Award, the Arbitrator found that Respondent and Counterclaimant Loida

24 Nicholas Lewis had prevailed on the main claims arising under the Contract[1] by defeating the claim

25 of Claimant and Cross-Respondent BroadcastUrban Filmworks LLC to the effect the Short Film

26 _____

27      [1] Capitalized terms not otherwise specifically defined in this Final Arbitration Award have the
        meanings ascribed to them in the Interim Award.

28

1    prevented the Reversion and indefeasibly vested the Rights with BroadcastUrban in perpetuity, and
2    by establishing to the contrary that the Reversion did in fact occur. Ms. Lewis also prevailed on the
3    related tort claims that BroadcastUrban alleged against her. However, Ms. Lewis did not prevail on
4    her claim for copyright infringement, and instead BroadcastUrban defeated that claim.

5    The Contract provides that the prevailing party to any arbitration arising under it "shall be
6    entitled to recover its reasonable attorneys' fees and expenses," Contract at 6, ¶ 13, and the
7    Copyright Act authorizes but does not in all cases require an award of attorneys' fees to a party
8    prevailing under that statute, *see* 17 U.S.C. § 505. Taking all of the circumstances of this matter
9    into account, the Arbitrator held that Ms. Lewis was entitled to recover a portion, but not all, of the
10    reasonable attorneys' fees and expenses that she actually incurred in connection with these
11    proceedings.

12    Both parties submitted briefing and evidence in response to that conclusion. Ms. Lewis
13    provided copies of her law firm's invoices and related documents to establish that she incurred a
14    total of $182,639.91 in attorneys' fees and costs[2] in connection with this matter, and she insisted
15    that an award of anything less than that full amount would "disregard[] the parties' Contract" and
16    constitute "a remedy not contemplated by the arbitration agreement."

17    As a matter of the governing District of Columbia and federal law, this is not correct. "A
18    prevailing party is not, however, automatically entitled to full attorneys' fees. Rather, 'the degree
19    of the plaintiff's overall success goes to the reasonableness of a fee award.' This concept that an
20    award of attorneys' fees should be proportional to the degree of overall success in the lawsuit
21    applies not only in civil rights litigation, but also to contract disputes." *FCE Benefit*
22    *Administrators, Inc. v. George Washington University*, 209 F. Supp. 2d 232, 244-245 (D. D.C.
23    2002), citing *Texas State Teachers Association v. Garland Independent School District*, 489 U.S.
24    782, 793 (1989) and *Fleming v. Carroll Publishing Co.*, 581 A.2d 1219, 1228 (D.C. 1990).

_____

26    [2] This includes the $179,639.91 reported in Ms. Lewis' fee application, together with the final
27    $3,000 in arbitral fees paid after that application was filed.

28

34016/013/ 1013981v1.6

1   Furthermore, even if the Arbitrator was somehow required to award Claimant the full

2   amount of her attorneys' fees and costs under the parties' contract without regard to her "degree of

3   overall success," *FCE, supra*, the Arbitrator would still have discretion to make an offsetting award

4   of fees and costs to BroadcastUrban under the Copyright Act, 17 U.S.C. § 505, which would of

5   course have the effect of reducing whatever fee award might be available under the Contract. *See,*

6   *e.g., Fleming, supra*, 581 A.2d at 1228, noting that "[i]n cases involving a counterclaim which

7   operates to lessen, but not extinguish, the plaintiff's recovery, it has been held that the amount of

8   attorneys' fees allowable under a contract provision or stipulation should be commensurately

9   reduced."

10      In finding that Ms. Lewis will recover less than the totality of her actual attorneys' fees and

11  costs in this proceeding, the Arbitrator is independently exercising his authority (a) to determine

12  the extent of the fees and costs claimed by Ms. Lewis under the Contract that are actually

13  "reasonable" under all of the circumstances,[3] including but not limited to her unsuccessful

14  prosecution of the closely related copyright claims; (b) to consider the extent of a partially

15  offsetting fee award in favor of BroadcastUrban under the Copyright Act; and (c) to determine

16  within his "sole discretion" whether or not Ms. Lewis should recover "some or all of [her]

17  attorney's fees and costs if the Arbitrator determines it is an appropriate case for such an award."

18  IFTA Rule 14.1.3. *See also* Cal. Civ. Proc. Code §§ 1297.318(a), (b)(2) and *see* D.C. Code § 16-

19  4421(b), the latter statute providing that when a contract provides for the recovery of attorneys'

20  fees to a prevailing party, an Arbitrator "may," and not "shall," make such an award.

21

22

---

23  [3] For clarity: The Arbitrator does not find any impropriety at all in the hourly rates or total fees
    charged to Ms. Lewis by her counsel. To the contrary, those hourly rates are consistent with, or
24  less than, those customarily charged by lawyers in either New York City or Los Angeles with
    comparably excellent credentials, experience and skill, and the total fees charged by those lawyers
25  were reasonable in light of the substantial volume and high quality of work that they actually
    produced and performed.    As set forth in the text *infra*, the sole issue regarding the
26  "reasonableness" of the total fees claimed by Ms. Lewis relates to her assertion and unsuccessful
    prosecution of claims under the Copyright Act and to "the degree of overall success in the lawsuit,"
27  *FCE Benefit, supra*, that she achieved.

28

3

1        Although both parties devoted a substantial majority of their time to litigation of the
2 contract and related tort claims, Ms. Lewis is not correct that her "copyright claim was not
3 litigated" at all. Ms. Lewis' Counterclaim demanded that she recover her "attorneys' fees and
4 expenses incurred in this matter pursuant to the Copyright Act and/or Paragraph 20 of the Option
5 Agreement," and that same demand was repeated – word for word – in her briefing on the eve of
6 the final evidentiary hearing. In that latter briefing, Ms. Lewis further specifically invoked the
7 Copyright Act to also demand an award of statutory damages, a permanent injunction and an order
8 directing the impound and destruction of allegedly infringing material.

9        The parties further stipulated that the Arbitrator review carefully both the Book and the
10 Short Film before the beginning of the evidentiary hearing. The similarity between those two
11 works was the only relevant evidence on Ms. Lewis' copyright case-in-chief, since there was no
12 dispute that Ms. Lewis owned the copyright in the Book and that BroadcastUrban had access to it,
13 and since the Short Film was the only work that Ms. Lewis ever alleged to have been created in
14 infringement of her copyright. "To establish a successful copyright claim, a plaintiff must show:
15 (1) [her] ownership of the copyright; (2) the defendant's access to [her] work; and (3) 'substantial
16 similarity' between the defendant's work and [her] own." *Berkic v. Crichton*, 761 F.2d 1289, 1291
17 (9th Cir.), *cert. denied* 474 U.S. 826 (1985). Since the only relief that Ms. Lewis sought under the
18 Copyright Act was statutory damages, injunctive relief and attorneys' fees, the Arbitrator's
19 comparison of the two works was literally the only "litigation" to be done in connection with Ms.
20 Lewis' copyright claims,[4] and the parties instructed the Arbitrator to do it before the evidentiary
21 hearing even began.

22
23
24

25     [4] The copyright claim also implicated issues under the Contract, concerning the validity of the grant and exercise of the option. However, even if the Contract had never existed at all, Ms. Lewis still could not have prevailed on her copyright claim without showing that BroadcastUrban had
26 created a work that was "substantially similar" to the Book after "historical facts are filtered out."
27 *Effie Film, LLC v. Pomerance*, --- F.Supp.3d ---, 2012 U.S. Dist. LEXIS 179030 (S.D. N.Y. Dec. 18, 2012). *See generally* Interim Award.

28

4

1   Issues of "substantial similarity" are frequently resolved before or without an evidentiary
2   hearing. "When a court is called upon to consider whether the works are substantially similar, no
3   discovery or fact-finding is typically necessary, because 'what is required is only a visual
4   comparison of the works.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57,
5   64 (2d Cir. 2010), citing *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991).
6   "In copyright infringement actions, 'the works themselves supersede and control contrary
7   descriptions of them,' including 'any contrary allegations, conclusions or descriptions of the works
8   contained in the pleadings.'" *Id.*, citing *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir.
9   1986), 3-12 *Nimmer on Copyright* § 12.10, *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434
10  (S.D. N.Y. 1985), and *Shipman v. R.K.O. Radio Pictures, Inc.*, 20 F. Supp. 249, 249 (S.D. N.Y.
11  1937).

12      There was no hint at all that Ms. Lewis had abandoned her claim for copyright infringement
13  until six weeks after the evidentiary hearing had ended, when the parties submitted their Post-
14  Hearing Briefs on December 28, 2012. The brief that Ms. Lewis filed that day included a single
15  sentence at the end purporting to dismiss her copyright claim, although federal law does not permit
16  such a claim to be dismissed in that manner after the presentation of evidence has concluded, and
17  although no leave to proceed in any other way had ever been sought.

18      If Ms. Lewis had validly dismissed her claims for copyright infringement without
19  prejudice, BroadcastUrban would have no entitlement to attorneys' fees under the Copyright Act at
20  all.[5] *See Cadkin v. Loose*, 569 F.3d 1142, 1145 (9th Cir. 2009), *cert. denied* --- U.S. --- (2010).
21  Although those claims were not validly dismissed and were instead fully adjudicated on the merits,
22  BroadcastUrban has submitted no evidence concerning the amount of attorneys' fees or costs that it
23  actually incurred in defending against those claims. Furthermore, although Ms. Lewis is incorrect
24  in arguing that her copyright claims were never litigated at all, she is correct that the resources

25

26  [5] The Arbitrator cannot determine in hindsight how a hypothetical motion by Ms. Lewis
    seeking leave to dismiss her copyright claims might have been resolved, since BroadcastUrban was
27  never given the opportunity to consent to or oppose it.

28
                                        5

34016/013/ 1013981v1.6

devoted to those claims represented at best a small fraction of those devoted to litigation of the contract and tort claims. Furthermore, given the evidence adduced at the Arbitration Hearing, a close comparison of the Book to the Short Film might still have been necessary to resolve other issues related to the Reversion. The final net award of fees and costs to Ms. Lewis' includes the Arbitrator's assessment of the modest amount of reasonable attorneys' fees and costs that might credibly be attributable solely to both the prosecution and defense of the copyright claims.

The Arbitrator also notes that the total legal fees incurred by Ms. Lewis were likely increased by many of BroadcastUrban's unsuccessful but very aggressive litigation tactics. BroadcastUrban began the case by accusing Ms. Lewis' counsel of deliberately lying to the Arbitral Agent in order to obtain a one-week extension of time to respond to the Statement of Claim, but BroadcastUrban was unable to substantiate those very serious charges.[6] Next, BroadcastUrban sought an injunction that would among other things have operated as an extremely broad prior restraint on speech, but it submitted no evidence in support of that application at all and provided no citation to legal authority of any kind. BroadcastUrban did not even offer evidence to show that it was suffering an injury, much less an injury that was substantial, immediate and irreparable enough to support such an "extraordinary and drastic" interlocutory remedy. *RCM Technologies v. Beacon Hill Staffing Group*, LLC, 502 F. Supp. 2d 70, 72 (D. D.C. 2007).

Much later, just seventeen hours before the final evidentiary hearing was to begin, BroadcastUrban's law firm unilaterally withdrew from this entire proceeding because it had for undisclosed reasons suddenly concluded that its continued representation of BroadcastUrban would be unlawful. *See* Interim Award, note 2. Less than two days after that, BroadcastUrban produced thousands of new documents to Ms. Lewis and its counsel then re-appeared in the case to begin the evidentiary hearing later that same afternoon. Then, in the middle of the evidentiary hearing,

---

[6] BroadcastUrban also sought an inappropriate remedy, demanding in essence that Ms. Lewis be placed in immediate and presumably incurable default for the alleged misconduct of her counsel. If BroadcastUrban's charges had any merit, the proper remedy would likely have been directed at Ms. Lewis' counsel, not at his client.

6

1  BroadcastUrban interrupted the presentation of evidence to argue that its efforts to impeach Ms.
2  Lewis' testimony actually demonstrated that she was guilty of criminal perjury.

3      To the extent that BroadcastUrban might otherwise have been able to invoke the Copyright
4  Act to recover any of its own attorneys' fees or costs (or to offset an award of such fees and costs
5  to Ms. Lewis under the Contract), these issues must be taken into account as well. Especially in
6  copyright cases, courts "may fashion a fee award for the purpose of discouraging 'overly
7  aggressive litigation tactics' and encouraging parties 'to litigate in a more responsible, realistic
8  manner.'" *T-Peg, Inc. v. Vt. Timber Works, Inc.*, 669 F.3d 59, 62 (1st Cir. 2012), citing *Bridgeport
9  Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 595 (6th Cir. 2008). The Arbitrator has taken these
10  issues into consideration, as well.

11      For all of the reasons set forth herein and in the Interim Award, the Arbitrator will reduce
12  the total amount of attorneys' fees and costs sought by Ms. Lewis by just 10%, for a total award of
13  $164,375.92. As explained in the Interim Award, BroadcastUrban is on account of the Reversion
14  also entitled to be repaid the $35,000 that it paid to exercise its option, and so after accounting for
15  that further offset Ms. Lewis is entitled to a total cash award of $129,375.92. That amount includes
16  all fees, costs and other sums of any kind or nature to which either side is entitled as a result of the
17  final adjudication of all of the claims, defenses and issues presented in this arbitration.

18  **FINAL AWARD**

19  For all of the reasons set forth herein and in the Interim Award:

20  1.      The Interim Award is adopted in full as part of the Final Award in this matter.

21  2.      Respondent and Counterclaimant Loida Nicholas Lewis shall have and recover from
22  Claimant and Cross-Respondent BroadcastUrban Filmworks LLC the total sum of $129,375.92,
23  which amount is due and payable on the date of this Final Arbitration Award, and upon which
24  interest shall accrue from that date at the rate prescribed by D.C. Code § 28-3302(c).

25  Done at Los Angeles, California USA on March 20, 2013.

26  _____
        Michael L. Novicoff, Sole Arbitrator
27      Independent Film and Television Alliance

28                                  7

1   State of California

2   County of Los Angeles

3      Subscribed to before me on this 20th day of March, 2013, by Michael L. Novicoff, proved

4   to me on the basis of satisfactory evidence to be the person who appeared before me.

5   Signature

6                             Seal:

7

8 

ELLEN C. GRAUNKE
Commission # 1847384
Notary Public - California
Los Angeles County
My Comm. Expires May 2, 2013

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

1 | Michael L. Novicoff, Arbitrator
IFTA INTERNATIONAL ARBITRATION TRIBUNAL
2 | 1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024-3503
3 | Telephone: (310) 500-3500
Facsimile: (310) 500-3501
4 | E-Mail: mnovicoff@linerlaw.com

5

6

7

8 | **INDEPENDENT FILM AND TELEVISION ALLIANCE**

9 | **INTERNATIONAL ARBITRATION TRIBUNAL**

10

11 | BROADCASTURBAN FILMWORKS, LLC,                )   Case No. 12-50
                                                 )
12 |              Claimant,                       )   **INTERIM ARBITRATION AWARD**
                                                 )   **RESOLVING MERITS OF DISPUTE**
     |           vs.                              )
13 |                                             )
     | LOIDA NICOLAS LEWIS,                       )
14 |                                             )
     |              Respondent.                   )
15 |_____)

16     This matter concerns a contract granting an option for the exclusive rights to develop one or

17 more motion pictures based upon a biographical literary work. For the reasons set forth herein, the

18 Arbitrator finds that the option for the acquisition of those rights was validly exercised and the

19 rights validly acquired, but that those rights have now reverted to the owner of the underlying

20 literary work. However, the short film created prior to the reversion does not infringe the copyright

21 in the underlying literary work,[1] and would not have infringed that copyright even if it had been

22

23     [1] In a single sentence at the end of her Post-Hearing Brief, the Respondent gave notice for the
first time of an intention to dismiss her counterclaim for copyright infringement without prejudice.
24 *See* Respondent's Post-Hearing Brief, p. 35; *compare* Respondent's Pre-Hearing Brief, pp. 23-24,
seeking among other things an award of attorneys' fees for copyright infringement as well as an
25 order to impound and destroy all copies of the Claimant's allegedly infringing work. There has
been no motion or stipulation to permit a dismissal in that form, and a party may not under federal
26 law unilaterally dismiss a claim for copyright infringement without prejudice after the presentation
of evidence has concluded. *See* Fed.R.Civ.P. 41(c). In addition, the Arbitrator finds it both
27 "appropriate" and "just and proper" to provide an adjudication of that claim now, in order to
resolve related claims, to provide guidance to the parties and to prevent a multiplicity of future
28 proceedings. *See* Demand for Arbitration, p. 9; Response to Demand for Arbitration, p. 15. The
(Continued...)

1  created after the reversion or otherwise without any rights to the underlying literary work at all.
2  Indeed, as explained in this Award, the reversion does not generally prevent anyone else, including
3  the producer of that short film, from publishing or producing future biographical books, motion
4  pictures or other works about the same historical figure. Each party's claims for monetary damages
5  of any kind against the other are denied, as is any other form of relief not specifically granted in
6  this Award.

7  These conclusions were reached following an evidentiary hearing that was held on
8  November 13, 14, 15 and 16, 2012. The parties presented sworn testimony from multiple
9  percipient witnesses during that hearing, and the Arbitrator personally heard and observed each of
10 the witnesses and made appropriate conclusions as to each witness' knowledge and credibility.[2]

11 In addition to the live testimony, the parties also presented extensive documentary
12 evidence. The authenticity of the documentary evidence was not questioned by either party, and to
13 the extent that the relevant documentary evidence might be susceptible of multiple interpretations,
14 the Arbitrator applied the interpretation most consistent with the credible testimony given at the

15

16 (...Continued)

17 Arbitrator's "authority extends to issues raised both explicitly and implicitly by the [parties']
   contract and the arbitration demand submissions." *United States Life Ins. Co. v. Superior National*
18 *Ins. Co.*, 591 F.3d 1167, 1178 (9th Cir. 2010).

19 [2] The parties were distrustful of one another during discovery proceedings, and they stipulated
   to an Order which provided, among other things, that "[a]ny party which has failed to produce
20 responsive documents according to counsel's agreement for discovery may face evidentiary, issue-
   preclusion or other sanctions, and such a failure may also affect the credibility to be accorded to
21 each party's testimony." Order of October 29, 2012.

   The Arbitration Hearing was scheduled to commence on Monday, November 12, 2012. At
22 4:56 pm on the previous Sunday evening, November 11, counsel for BroadcastUrban announced by
   e-mail that it had determined that it was required to withdraw from this proceeding pursuant to
23 California Rule of Professional Conduct 3-700(B)(2), because it had concluded that "continued
   employment will result in violation of [the California Rules of Professional Conduct] or of the
24 State Bar Act." *See* HT at 5:5 to 6:15. On the morning of Tuesday November 13, however,
   BroadcastUrban produced a total of 2,060 additional documents to Ms. Lewis, and its counsel then
25 said that because of this production, it no longer felt that its continued representation of
   BroadcastUrban would be unlawful or unethical. *See* HT at 52:4 to 53:11. Both parties were
26 offered a substantial continuance of the proceedings in light of those developments, but both
   declined and insisted instead that they wished to continue with the Arbitration Hearing later that
27 same day, according to the schedule already in place. *See* HT at 53:12 to 54:14.

28

2

34016/013/ 1006929v1.2

1  hearing, with the other documentary evidence, and with commercial practice within the
2  entertainment industry generally and concerning the development of motion pictures from literary
3  material in particular. The Arbitrator also reviewed carefully both of the creative works at issue.
4  No evidence of any kind proffered by either party was excluded from consideration.[3]

5       In addition to their oral presentations, counsel for the parties also submitted extensive
6  written argument in the form of both Pre-Hearing and Post-Hearing briefs. After the Post-Hearing
7  Briefing was complete, both parties submitted all of the disputes between them for final decision by
8  the Arbitrator. This Award represents the Arbitrator's best effort to resolve all of the parties'
9  disputes and to fashion relief which is just and fair under the circumstances existing at the time of
10 the arbitration.

11 The Literary Work

12      Respondent Loida Nicholas Lewis is the widow of Reginald F. Lewis, one of the most
13 successful African-American business leaders in United States history. Mr. Lewis lived during a
14 turbulent era, and the parties agree that his life story is both inspiring and engrossing. Mr. Lewis
15 was born in Baltimore in 1942 and attended Virginia State University during the early 1960s, then
16 graduated from Harvard Law School in 1968. He worked for a short time at one of New York's
17 most prominent law firms during the late 1960s before starting his own law practice, where he also
18 worked to acquire businesses with the assistance of both equity investors and debt finance. Mr.
19 Lewis came to national attention in the late 1980s, when he used a leveraged buyout to acquire the
20 international division of Beatrice Foods (thereafter known as TLC Beatrice) and became the first
21 African-American chief executive of a Fortune 500 company. He also became a noted

22

23 [3] Neither party relied upon any expert testimony. The Claimant did call one expert witness,
   Mark Litwak, who was examined by each party during the evidentiary hearing. Immediately
24 before resting their cases, however, the parties stipulated to strike all of Mr. Litwak's testimony.
   *See* Hearing Transcript ("HT") at 892:19 to 893:5. However, in agreeing to have disputes arising
25 under the Contract resolved by IFTA arbitration, the parties selected "procedures specifically
   tailored to the context from which the agreement to arbitrate arises, [to be] conducted by arbitrators
26 who are expert in the norms and practices of the relevant industry." *Pearce v. E.F. Hutton Group,*
   *Inc.*, 828 F.2d 826, 829 (D.C. Cir. 1987). *See* Exhibit R-3, noting the parties' selection of this
27 tribunal over the American Arbitration Association because "only [IFTA] has film experience."

28

3

1  philanthropist, giving to a wide variety of causes and institutions, many of which bear his name
2  today.[4] At the time of his death from cancer in 1993, when he was only 50 years old, Mr. Lewis
3  was the wealthiest African-American person in the world. *See* Respondent's Pre-Hearing Brief, p.
4  2.

5  It is clear that both Mr. Lewis and his wife wanted his story to be widely known, and Mr.
6  Lewis began work on an autobiography shortly before his death. With the Respondent's assistance
7  and very substantial additional written work by another author, that biographical work was
8  completed and published in 1994 under the title *"Why Should White Guys Have All The Fun?" See*
9  *generally* HT at 498:14 to 501:20. This literary work is referred to in this Award as the "Book."

10  The Book includes the actual autobiographical text written by Mr. Lewis, along with
11  extensive further biographical material researched and written after his death. The Book presents
12  itself as nonfiction and indeed as a work of contemporary history, with a Forward noting that care
13  was taken to "ensur[e] that events were accurate" and that "the nuances of [Mr. Lewis']
14  personality" were correctly portrayed. *See* Book (Forward).[5]

15

16

17  [4] Just by way of example: There is the Reginald F. Lewis Museum of Maryland African
    American History and Culture in Baltimore; the Reginald F. Lewis School of Business at Virginia
18  State University; the Reginald F. Lewis International Law Center at Harvard University; and the
    NAACP Reginald F. Lewis Youth Entrepreneurial Institute, which operates throughout the United
19  States.

20  [5] Citations in this Award to specific pages in the Book refer to the paperback version of *"Why
    Should White Guys Have All The Fun?"* published in 2005 by Black Classic Press and entered into
21  evidence at the Arbitration Hearing as Exhibit R-26. This is the only version of the Book which
    either party offered into evidence, and it does bear a 1995 copyright date consistent with the
22  description of the Book in the parties' contract. *See* Book at iv; Contract at 1, ¶ 1(b)(2).

    This Award cites most of the documentary evidence according to its Exhibit Number. For
23  clarity and ease of reading, however, the parties' contract (Exhibit C-1 and R-6), the book *"Why
    Should White Guys Have All The Fun?"* (Exhibit R-26) and the short film *"The Reginald F. Lewis*
24  *Story"* (Exhibit R-25) are generally cited in this Award simply as "Contract," "Book" and "Short
    Film," respectively.
25
    Citations in this Award to the text of the Contract are to the pages as numbered within Exhibit
26  C-1 and to the paragraph numbers on the cited page of the Contract itself.

    Citations in this Award to scenes in the Short Film refer to the time code on the DVD lodged as
27  Exhibit R-25.

28
                                    4

<u>The Parties' Contract</u>

Jesse Wineberry is the principal of Claimant BroadcastUrban Filmworks LLC ("BroadcastUrban"). In 2000 or 2001, Mr. Wineberry had a chance meeting with a person who was then assisting Ms. Lewis in developing a feature film based upon the Book. Mr. Wineberry was familiar with the Book and eventually decided to pursue this project on behalf of BroadcastUrban. After first speaking with Mr. Lewis' mother, Mr. Wineberry wrote directly to Ms. Lewis and was then invited to make a presentation to her and to some of her colleagues in New York. *See generally* HT at 69:2 to 77:14; 505:14: to 508:4.

Although other potential producers were also seeking to develop the Book into a feature film, Ms. Lewis eventually decided to make a deal with BroadcastUrban and the parties memorialized their agreement in a signed written contract (the "Contract") governed by the law of the District of Columbia. *See* Exhibits C-1 and R-6. Because the relevance of the parties' communications preceding the execution of the Contract cannot under District of Columbia law be determined until after an analysis of the contractual language itself, *see generally infra*, those events are discussed later in this Award.

The whole of the Contract consists of four separate documents: An "Option/Literary Purchase Agreement" (Contract at 1-6); a "Literary Purchase Agreement" (Contract at 7-22); an "Option Agreement" (Contract at 23); and a "Short Form Copyright Assignment" (Contract at 24). The latter three documents are attached as Exhibits A, B and C to the first document, and the text makes clear that all four documents are intended as part of a single agreement, reciting that "[t]his agreement, including the Exhibits attached hereto, contains the full and complete understanding and agreement between the parties with respect to the subject matter, and supersedes all other agreements between the parties whether written or oral relating thereto, and may not be modified or amended except by written instrument executed by both of the parties hereto." Contract at 6, ¶ 14. *See also* the similar language in the Contract at 22, ¶ 21(j), 24 and 25.

In the Contract, Ms. Lewis granted BroadcastUrban an "exclusive and irrevocable option to purchase" certain rights throughout the world (the "Rights"), Contract at 2, ¶ 2, including the right

5

1 to "make, produce, adapt and copyright one or more motion picture adaptations or versions . . .
2 based in whole or in part on the" Book. Contract at 8, ¶ 1(a). BroadcastUrban paid $5,000 for this
3 option, which by its terms was to "commence on the execution date of this agreement and [expire]
4 twelve months later." However, BroadcastUrban was also given the right to extend the option for
5 "two additional twelve month periods by a payment of $5,000 each year, on or before the
6 expiration date of the initial option period."[6] Contract at 2, ¶ 3.

7       To exercise the option, BroadcastUrban was required merely to "serve upon [Ms. Lewis]
8 written notice of the exercise thereof." Contract at 3, ¶ 4; 20, ¶ 19. If the option was exercised,
9 BroadcastUrban was obligated to pay Ms. Lewis an additional $50,000, but not until "the
10 commencement of principal photography."[7] Contract at 13, ¶ 5.

11       Upon exercise of the option, BroadcastUrban would acquire the Rights "in perpetuity,"
12 Contract at 13, ¶ 4, but subject to a reversion (the "Reversion") if "the initial motion picture is not
13 produced" within five years. Contract at 19, ¶ 13. The Reversion is expressed slightly differently
14 elsewhere in the Contract: "If [BroadcastUrban] exercises option, but a motion picture is not made
15 five years after date of exercise, all rights revert to [Ms. Lewis], subject to [her] repayment of
16 purchase price (less amounts paid for option periods), and upon [her] execution of all documents to
17 effectuate reversion." Contract at 5, ¶ 9(c). The Reversion is an integral part of the Rights, and
18
19

20   [6] This highlights the first of many apparently careless errors in the drafting of the Contract,
21 since the Contract says that the option may be extended for "two additional twelve month periods
by a payment of $5,000 *each year*, on or before the expiration date of the *initial* option period."
22 Contract at 2, ¶ 3. Of course, since by definition the *initial* option period only has one expiration
date, it is literally not possible to make successive annual payments on or before that date "*each*
23 *year*." It is clear from the rest of the Contract, and from the parties' conduct, that they actually
meant to require that extension payments be made on or before the expiration of the option, and
24 perhaps could better have expressed that deadline as the *anniversary* of "the expiration date of the
initial option period."

25   [7] As discussed in greater detail *infra*, this is a very unusual provision for a literary option
agreement. Normally such agreements provide that options may not be exercised, and the rights to
26 literary work may not be acquired, without an accompanying cash payment or at least a date certain
upon which such a payment will be made. *See, e.g.*, Selz, Simensky, Acton and Lind,
27 *Entertainment Law* (2d Ed. 2007) §§ 30.72, 31:3.

28

6

1  every significant reference to the duration of the Rights anywhere in the Contract expressly
2  references the Reversion as well. *See* Contract at 4, ¶ 5; 13, ¶ 4; 15, ¶ 7(c); 16, ¶ 9(e); 19, ¶ 13; 24.

3      The parties disagree about the date when the Contract was "executed" and what date fell
4  "twelve months later." The Contract recites that it "is made and entered into as of December 12,
5  2003," Contract at 1, Preamble, but that recital is not conclusive to establish the date of execution
6  under District of Columbia law. *See, e.g., District of Columbia v. Camden Iron Works*, 181 U.S.
7  453, 461 (1901), affirming the decision of the District of Columbia's Court of Appeals to the effect
8  that when contracts governed by District of Columbia law refer to periods measured from "the date
9  of the execution of the contract," "[i]t is well settled that in such circumstances, it may be averred
10  and shown that a deed, bond, or other instrument was in fact made, executed, and delivered at a
11  date subsequent to that stated on its face."

12      Because the Contract imposed obligations on both parties and was to be signed by them
13  both, *see* Contract at 6, 22-24, it was clearly the parties' mutual intention that neither be bound
14  until and unless the other was bound. Furthermore, because the Contract granted an exclusive
15  license to a copyrighted work, federal law required an actual signature before any agreement came
16  into existence at all. *See* 17 U.S.C. § 101, 204(a).[8]  When a signature on such a copyright license is
17  notarized, federal law further prescribes that the "notarization is prima facie evidence of the
18  execution." 17 U.S.C. § 204(b)(1).

19      Both parties' signatures on the Contract were indeed notarized, and it is thus established
20  that Ms. Lewis did not actually sign the Contract until December 23, 2003 and that Mr. Wineberry
21  did not sign it on behalf of BroadcastUrban until December 30, 2003. *See* Contract at 23 and 24.

22

23  _____
    [8] "Although Section 204 is often referred to as the 'copyright statute of frauds,' it actually
24  differs materially from state statutes of frauds. While the latter may be satisfied by a writing not
    intended as a memorandum of contract, not communicated to the other party, and even made in
25  pleadings or testimony years after the alleged agreement [citations], Section 204 may not. State
    statutes of frauds serve a purely evidentiary function - to prevent enforcement through fraud or
26  perjury of fictitious agreements. [Citation.] Thus, agreements subject to statutes of frauds may be
    perfectly valid, yet unenforceable without evidence of a writing. By contrast, a transfer of
27  copyright [including an exclusive license] is simply 'not valid' without a writing." *Konigsberg
    Int'l v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994).

28

7

1 As a result, the "execution date" of the Contract was December 30, 2003, when the last of the
2 parties signed it and both first became bound to its terms,[9] and the initial term of the option thus ran
3 until December 30, 2004.

4 The Initial Option Term

5        Sometime in 2004, shortly after it signed the Contract and before the expiration of the first
6 option term, BroadcastUrban learned that Rene "Butch" Meily, TLC Beatrice's former head of
7 public relations, had in 1996 written his own script for a motion picture based upon the Book. Mr.
8 Wineberry testified that he discussed the Meily script with Ms. Lewis at that time, and that she told
9 him then that "he did it all on his own." *See* HT at 190:13 to 192:1. Eventually BroadcastUrban
10 learned, and Ms. Lewis testified, that she had given Mr. Meily $5,000 to help "finance" his work
11 on this script, *see* HT at 696:16 to 697:4, although Mr. Meily denied that this payment gave Ms.
12 Lewis any interest in the script that he created. *See* Exhibit C-48.

13        In these proceedings, BroadcastUrban alleged that Ms. Lewis' failure to disclose the
14 existence of the Meily script constituted an actionable breach of the Contract as well as fraud, since
15 Ms. Lewis represented in the Contract that except for the Book and a specific television
16 documentary, "no motion picture or dramatic version of the Property [Book], or any part thereof,
17 has been manufactured, produced, presented or authorized . . .." Contract at 14, ¶ 6(b)(iii).

18        Since Mr. Meily's script was never produced, it is not at all clear that it is a "part" of a
19 "motion picture or dramatic work" at all. Indeed, it is not even clear whether the phrase "part
20 thereof" in this sentence modifies "motion picture" or "Property" – that is, Ms. Lewis may be
21 representing that no motion picture version of any part of the Book has been produced, not that no
22 part of a motion picture version of the Book has been produced. In this regard, as in many others,
23 the Contract is poorly-drafted and ambiguous.

24

25

26        [9] On December 30, 2003, BroadcastUrban also returned a fully-executed counterpart of the
   Contract to Ms. Lewis and recorded certain portions of the Contract with the Copyright Office. *See*
27 Exhibit R-6 at 23 and 24; Exhibit R-7.

28

8

1    It is, however, not necessary to resolve this ambiguity since BroadcastUrban's claim is in
2  any event plainly barred by the three-year statute of limitations prescribed by District of Columbia
3  law for actions based upon either fraud or breach of contract. *See* D.C. Code §§ 12-301(7), (8).
4  BroadcastUrban concedes that it knew of the existence of the Meily script since at least early 2004,
5  and that it not only took no action during that period but, as described *infra*, also thereafter twice
6  renewed and then exercised its option to acquire the Rights. Although BroadcastUrban does not
7  appear to have learned until several years later that Ms. Lewis had paid $5,000 in expenses
8  associated with the preparation of Mr. Meily's script, it is Ms. Lewis' failure to disclose the mere
9  existence of the script, and not her financial contribution to it, that constitutes a breach of contract
10 or misrepresentation under BroadcastUrban's theory of recovery.[10] Because BroadcastUrban knew
11 of the script's existence since at least 2004, any claim for damages based upon Ms. Lewis' alleged
12 failure to disclose that fact was already time-barred long before the commencement of these
13 arbitration proceedings.

14 Extension of the Option

15    On December 10, 2004, BroadcastUrban made a second $5,000 payment to Ms. Lewis to
16 extend the option for an additional twelve-month period. *See* Exhibit C-2 at 1. That extension
17 payment was timely and operated to extend the option until December 30, 2005.

18    On December 23, 2005, BroadcastUrban sent another $5,000 check to Ms. Lewis in order to
19 extend the option for another twelve months. *See* Exhibit C-2 at 2. Ms. Lewis testified that she
20 initially sought to reject that payment, *see* Exhibit R-8, because she "was starting to be doubtful or
21 anxious, anxious is more the word, whether he is up to this big promise [about developing a feature
22 film] that was sold to me when I signed the contract, the option, Literary Purchase Agreement."

23

---

24    [10] BroadcastUrban knew in 2004 that Mr. Meily had registered his script with the Writers Guild
    of America, *see* HT at 194:14-23, and it claims that whatever harm it suffered came about because
25 other writers "declined to get involved with BroadcastUrban after discovering that a screenplay
    already existed." Claimant's Post-Hearing Brief at 20. *See also* Exhibit C-48, in which
26 BroadcastUrban told Mr. Meily that "it is extremely difficult to convince WGA union screenwriters
    to sign on as the screenwriter for a picture when there is already a screenplay on file at the WGA of
27 the exact same title, subject and book as the one we're asking them to write."

28

9

1 HT at 547:7-10. However, that second extension payment was also timely and Ms. Lewis had no
2 right at that time to prevent extension of the option. In the end, Ms. Lewis retained
3 BroadcastUrban's check but did not cash it, *see* HT at 552:10-11 and Exhibit R-9, and
4 BroadcastUrban's tender of that payment operated to extend its option until December 30, 2006.[11]

5 Exercise of the Option

6 On December 21, 2006, BroadcastUrban timely exercised its option and purchased the
7 Rights. *See* Exhibit R-10. Although it was not required to do so, *see supra* note 7 and
8 accompanying text, BroadcastUrban also sent a $35,000 cashiers' check, representing the total
9 remaining amount due for the purchase of the Rights, along with its notice exercising the option.
10 Ms. Lewis acknowledged receipt of both the notice and the payment and, although she considered
11 returning the payment to BroadcastUrban, she did not do so, HT at 553:4 to 555:6; Exhibit R-11,
12 and did not then dispute that the option had been validly exercised. *See generally* HT at 672:19 to
13 673:11.

14 To the contrary, in fact, on several occasions after exercise of the option Ms. Lewis
15 affirmatively acknowledged BroadcastUrban's ownership of the Rights. *See* HT at 445:2-23. On

16 ────────────────────

17 [11] At the time, BroadcastUrban claimed that its second extension payment actually operated to
extend the option until December 31 (not 30), 2006. *See* Exhibit C-2 at 2 and Exhibit R-8.
18 Although not relevant to the resolution of this dispute, that calculation was not correct. As
commonly used in commercial agreements and especially in the expression of copyright license
19 terms, the phrase "twelve month period" refers to a time ending on the annual anniversary of an
event, not on the anniversary of the following day. *See, e.g., Atlantic City Coin & Slot Serv. Co. v.
20 IGT,* 14 F. Supp. 2d 644, 646 (D. N.J. 1998), noting that a copyright license extended for "an
additional month" from June 12 expires on July 12, not July 13. This does differ from the way in
21 which statutory deadlines are calculated, which generally exclude the day of the triggering event,
but that method applies only "in computing any time period specified . . . in a statute," not to
22 deadlines written into private contracts by the parties themselves. Fed.R.Civ.P. 6(a)(1)(A); *see also*
D.C. Super. Ct. Civ. R. 6(a).

23 Furthermore, if the option terms were in fact to be calculated consistently in a manner
excluding the last day of the preceding period, the initial "twelve month" option term would have
24 expired on December 31 (not 30), 2004, the first extension for an "additional twelve month period"
would have expired on January 1, 2006, and the second extension term of the same duration would
25 have expired on January 2, 2007 (not December 31, 2006, as recited in Exhibit C-2 at 2). This is
not correct, but as noted in the text of this Award this issue is not material since the Contract was
26 not "executed" until December 30, 2003. No matter what method of calculation is used to measure
from that date, BroadcastUrban's two extensions of its option, and its subsequent exercise of the
27 option, all occurred before the option ever expired.

28

10

1 April 4, 2008, for example, she told another party interested in developing a film based upon the
2 Book that "I would recommend that your people buy the copyright from Jesse Wineberry. That is
3 the only way."[12] Exhibit C-6 at 3. On December 29, 2009, she made a similar acknowledgement
4 and introduction to BroadcastUrban on behalf of another such interested party, *see* Exhibit C-47,
5 and on February 12, 2010, she said plainly to Mr. Wineberry that "you have the rights to" the
6 Book. Exhibit C-51. During the summer of 2009, Ms. Lewis also sought but failed to obtain
7 BroadcastUrban's consent to an amendment to the Contract which would have allowed her to
8 produce a single documentary motion picture based upon the Book. *See* Exhibits C-16, C-31, C-32
9 and C-33. Of course no such amendment would have been necessary if BroadcastUrban had not
10 previously exercised its option and validly acquired the Rights. *See also infra*, note 18.

11 Because of the timely exercise of its option, BroadcastUrban acquired the Rights "in
12 perpetuity" on December 21, 2006, subject only to the Reversion, which would divest
13 BroadcastUrban of the Rights and return them to Ms. Lewis if "the initial motion picture is not
14 produced" within five years of that date – that is, by December 21, 2011. Contract at 19, ¶ 13.

15 BroadcastUrban's Development of the Literary Property After Exercise of the Option

16 BroadcastUrban made many differing reports to Ms. Lewis and others about the state of its
17 financing to develop a motion picture based upon the Book. In its December 2006 letter exercising
18 the option, BroadcastUrban reported "tremendous progress on the film" and said, among other
19 things, that it had "signed a co-production agreement" with André Benjamin (sometimes known
20 professionally as André 3000) under which a feature film based upon the Book would be "the lead
21 film project of his 3-picture production deal with Paramount Pictures," that it was negotiating with
22 PBS to produce a separate 60-minute documentary based upon the life of Mr. Lewis "to coincide
23 with the release of the motion picture," and that it had "secured investment commitments totaling
24 up to $5 million" for the "initial financing" of the feature film. *See* Exhibit R-10.

25
26
---
27 [12] *See infra*, note 15 and accompanying text.
28
11

34016/013/ 1006929v1.2

1    Several years later, however, BroadcastUrban's plans had changed and its financing was
2 still not complete. Indeed, that financing still appeared very uncertain. On October 12, 2009,
3 BroadcastUrban made a presentation to a group of potential investors in Atlanta, Georgia. *See* HT
4 at 131:3-21.    That presentation made no mention of André Benjamin, but did say that
5 BroadcastUrban was at that time seeking to finance a $1 million "development budget" which
6 would, among other things, include $100,000 to produce a "short film." *See* Exhibit C-24 at 2, 17.
7 BroadcastUrban had by the time of this presentation also produced something it described as the
8 "Reginald Lewis Story Video Trailer," which it offered to provide to potential investors upon
9 request. Exhibit C-24 at 18.

10    Mr. Wineberry wrote to Ms. Lewis on March 31, 2010 to tell her that the Oscar®-winning
11 actor Jamie Foxx had agreed to portray Mr. Lewis "in the upcoming movie." Ms. Lewis responded
12 immediately with congratulations, noting that "Jamie Foxx would be great" in that role. *See*
13 Exhibit C-5.

14    In June 2010, Mr. Foxx signed an agreement under which he became "attached" to
15 BroadcastUrban's Reginald F. Lewis project, and that agreement recited that BroadcastUrban
16 intended at·that time to both begin and complete production during 2011 and that Mr. Foxx
17 expected to be available on that schedule so long as he was made "pay or play" before that time.
18 *See* Exhibit 28. Such a "pay or play" agreement would have required BroadcastUrban to guarantee
19 Mr. Foxx his full cash compensation for both his acting and producing services, consistent with his
20 "precedent and stature in the entertainment industry," even if the film was not actually produced, or
21 was produced without his involvement. *See, e.g., Lynch v. CIBY 2000*, 1998 U.S. Dist. LEXIS
22 23496 (C.D. Cal. 1998). No such "pay or play" deal was ever made with Mr. Foxx and, in general,
23 a producer cannot make such a deal until financing for a film is complete.[13]

24

25    [13] Mr. Wineberry testified that Mr. Foxx had agreed in principle to perform the role of Mr.
Lewis in exchange for only half of his usual fixed compensation for acting services, and had agreed
26 to postpone receipt of half of that discounted sum until the film was complete. Mr. Wineberry also
testified that there had been no negotiations yet concerning Mr. Foxx's fee for producing services,
27 but that he understood that the total fee for Mr. Foxx's acting services would be only about $5
million. *See* HT at 803-19 to 806:20. However, BroadcastUrban also adduced testimony to the
28                                                                                (Continued...)

12

1    Mr. Wineberry testified that he also spoke to Ms. Lewis at some point "during the Jamie

2  Foxx negotiations" "in 2010" to report that Mr. Foxx would not in fact be available to perform

3  services in time to defeat the December 2011 Reversion. HT at 288:19 to 289:9; 290:22 to 291:1.

4  Mr. Wineberry testified that he asked Ms. Lewis to agree to extend the Reversion date for that

5  reason, but that she refused to do so. *Id.*

6  Ms. Lewis' Conduct Following Exercise of the Option

7    For her part, Ms. Lewis was clearly frustrated with the pace of development.  In October

8  2007, she was approached by David Whitehead, who was also interested in developing a motion

9  picture based upon the Book.  At the Arbitration Hearing, Ms. Lewis testified initially that she

10 rebuffed Mr. Whitehead and told him orally and in writing over a six-month period that Mr.

11 Wineberry's company had the exclusive rights to such a project. *See* HT at 561:21 to 563:18 and

12 Exhibit C-6.  Later, on cross-examination, Ms. Lewis conceded that she had shortly after meeting

13 Mr. Whitehead given him a copy of the Book and asked him to send her "a copy of a finished

14 script." *See* HT at 578:12 to 580:1 and Exhibit C-60.[14]  Mr. Whitehead did eventually write a

15 script, which was registered with the Copyright Office on May 5, 2008.  He informed Ms. Lewis of

16 that registration the next day. *See* Exhibit C-6 at 1.

17    BroadcastUrban did not establish that Ms. Lewis was complicit in registering the

18 Whitehead script with the Copyright Office, and her statement to him could not plausibly be

19 construed as license to the copyright in the Book.  Indeed, the evidence shows that she wrote to Mr.

20 Whitehead on April 4, 2008 to say that "I would recommend that your people buy the copyright

21 from Jesse Wineberry.  That is the only way." Exhibit C-6 at 3.  In addition, when BroadcastUrban

22

23

---

24  (...Continued)

     effect that Mr. Foxx's customary fee for acting services in a feature film is presently between $15

25  million and $20 million. *See* HT at 806:21-25.

26  [14] At the Arbitration Hearing, BroadcastUrban argued that its cross-examination established
     that Ms. Lewis' earlier testimony was criminally perjurious. *See* HT at 746:13 to 749:9.  The
     Arbitrator does not find it established that Ms. Lewis "willfully and contrary to [her] oath, state[d]

27  as true any material matter which [she then knew] to be false." Cal. Penal Code § 118.

28

                                              13

1    learned in 2009 of the existence of the Whitehead script and complained about it to Ms. Lewis, she
2    offered to assist BroadcastUrban's counsel in taking legal action to force Mr. Whitehead to
3    "withdraw his copyright registration" and to make sure he "knows I am serious!" Exhibit C-6 at 1.

4        BroadcastUrban argues, however, that Ms. Lewis' expression of willingness to receive a
5    "finished script" from Mr. Whitehead breached her contractual obligations by "encumbering[ing],
6    diminish[ing] or impair[ing]" the Rights in the Book that she licensed to BroadcastUrban. *See*
7    Contract at 15, ¶ 6(d). That position is not correct or consistent with either the terms of the
8    Contract or with commercial practice in the entertainment industry, where those who have granted
9    rights in literary property subject to possible reversions do sometimes commission scripts or
10   otherwise take some initial steps toward the development of properties which they will only be able
11   to market or produce if a reversion occurs. Ms. Lewis' mere statement to Mr. Whitehead was not a
12   breach of contract nor an infringement of the enumerated exclusive Rights licensed to
13   BroadcastUrban.[15] *See* Contract at 8-10, ¶¶ 1(a)-(i).

14        In November 2009, shortly after BroadcastUrban's meeting with potential investors in
15   Atlanta, Mr. Wineberry sought a meeting with Michael Milken about the project. Mr. Milken
16   reported that request to Ms. Lewis, and Ms. Lewis responded through her assistant that "she does
17   know Jessie [sic] Wineberry but she is not working with him," and that "it's alright if Mike meets
18   with him but to be aware that after six years he still does not have financing for the movie."
19   Exhibit C-37; *see also* Exhibit C-45. Mr. Wineberry acknowledged that BroadcastUrban was "still
20   raising funds" at this time, HT at 229:20, but did still object to Ms. Lewis' sharing that information
21   with Mr. Milken, and especially with her choice of words. *See* HT at 227:16 to 228:9.

22

23

---

24   [15] BroadcastUrban also did not establish that it suffered any material damages as a result of Ms.
Lewis' October 2007 statements to Mr. Whitehead. Mr. Wineberry testified that executives at
25   Lions Gate Films cancelled a 2009 meeting with him when they learned of the Whitehead script,
"but it was not because of the script because I've never still to this day never seen the script, but it
26   was because of the filing, the copyright filing." HT at 397:15-21. As noted in the text, there is no
evidence to suggest that Ms. Lewis was responsible for that filing and indeed the evidence shows
27   that she offered at the time to assist BroadcastUrban in mitigating its alleged damage, although
BroadcastUrban did not accept that offer.

28

1  BroadcastUrban claims that Ms. Lewis' "unsupportive" statements to Mr. Milken "disparaged" it in

2  a manner expressly or impliedly forbidden by the Contract and also constituted a tortious

3  interference with its prospective business relationships, apparently because it had hoped among

4  other things that Mr. Milken would either provide some financing himself or introduce

5  BroadcastUrban to additional investors. *See* Claimant's Post-Hearing Brief at 23-9, citing Contract

6  at 2, ¶ 1(d); 4, ¶ 7; 14-15, ¶ 6(d), and *see also* HT at 167:16 to 168:8.

7      Ms. Lewis' statements to Mr. Milken were not tortious and did not contravene her

8  contractual obligations. Ms. Lewis did not have any obligations to assist in production financing,[16]

9  and BroadcastUrban has made no showing that it suffered any damages at all from her statements

10  to Mr. Milken. Indeed, Mr. Milken did spend several hours meeting with BroadcastUrban after

11  these statements were made. *See* HT at 167:18 to 168:8. There was nothing untrue in Ms. Lewis'

12  statements about the state of BroadcastUrban's financing, and BroadcastUrban would surely have

13  been required to disclose the same facts to Mr. Milken or any other potential investor as part of any

14  legitimate solicitation of funds. Furthermore, BroadcastUrban's sole theory of damages, which

15  "posits that fair compensation for this [alleged] harm should be an assessment of some fixed [but

16  unproven and unspecified] sum for every day since the date" of Ms. Lewis' statement to Mr.

17  Milken, Claimant's Post-Hearing Brief at 24, is offered without any support in the law at all.

18  Production of the Short Film

19      By mid-2011, it appears to have been clear to both parties that no film starring Jamie Foxx,

20  and indeed no feature film at all, would be produced before the Reversion which was scheduled to

21  occur on December 21, 2011. At around this same time, BroadcastUrban began accelerated pre-

22  production and production of the Short Film. *See* HT at 140:4-8. Cast auditions were held on

23  September 17, 2011. *See* Exhibit C-14. BroadcastUrban entered into an "Ultra Low Budget"

24

25

26  [16] However, the Contract does provide that if and only if Ms. Lewis "actively work[ed] with [BroadcastUrban] to promote and secure financing for film [sic]," she would be entitled to receive certain additional contingent compensation based upon BroadcastUrban's net profits. Contract at

27  13, ¶ 5.

28

15

1  agreement with the Screen Actors Guild one month later, on October 17, 2011. *See* Exhibit R-17.

2  Principal photography began on October 20, 2011 and lasted for eight days. *See* Exhibit C-17; HT

3  at 140:11-12. Each actor was paid only $12.50 per hour for his or her services. *See* Exhibit C-18.

4  The total budget for the Short Film was only $100,000, of which only $4,470 was dedicated to

5  post-production. *See* Exhibit C-17. Post-production was completed very swiftly, and on December

6  16, 2011, BroadcastUrban sent a copy of the Short Film to Ms. Lewis. The Short Film contains no

7  credits, is marked "For Internal Use Only," and includes unlicensed music.[17] *See* Exhibit R-25.

8  Along with the copy of the Short Film in that form, BroadcastUrban also sent Ms. Lewis a letter

9  stating its position that the Short Film "represent[ed] satisfaction of Section 9(c) of the

10  Option/Literary Purchase Agreement" and therefore prevented the Reversion. *See* Exhibit R-20.

11       On December 31, 2011, Ms. Lewis' daughter wrote on behalf of her mother to Mr.

12  Wineberry and said, among other things, that "[y]our option has now expired, as of Dec[ember] 23,

13  2011." *See* Exhibit C-34 at 6. In that statement and in subsequent email exchanges over the next

14  few days, Ms. Lewis' daughter did not appear to acknowledge either the exercise of the option or

15  the production of the Short Film. However, in later correspondence between both parties' counsel

16  before the commencement of these proceedings, it became clear that Ms. Lewis did not contest the

17  exercise of the option[18] but did dispute that the Short Film operated to prevent the Reversion. *See*

18

---

19  [17] The Short Film includes Dusty Springfield's hit song "Son of a Preacher Man," which is
20  played during a scene set in December of 1968, during the second date between Mr. Lewis and his
    future wife. Short Film at 1:16; *see generally* Book at 97, 101. The use of that song during that
21  scene is chronologically authentic; the song was released in November 1968 and was ubiquitous by
    mid-December. However, Mr. Wineberry testified that he did not think that BroadcastUrban
22  obtained a license to use the song and performance in the Short Film, HT at 476:12 to 477:6, and
    the production budget confirms that no funds were paid for any music licenses at all. *See* Exhibit
    R-18.

23  [18] A March 30, 2012 letter from Ms. Lewis' counsel did not dispute that the option had been
24  properly exercised on December 21, 2006, and to the contrary argued that "all rights in and to the
    [Book] have reverted" to Ms. Lewis because BroadcastUrban "failed to make the motion picture
25  contemplated by the parties." Exhibit C-35. This tacitly if not explicitly recognized that the option
    had been validly exercised, and rested Ms. Lewis' claim to the Rights entirely upon the
26  effectiveness of the Reversion. This is consistent with the Contract, since the option could, if not
    exercised, have never extended beyond December 2008. *See* Contract at 2, ¶ 3, limiting the
27  duration of the option to a maximum of five consecutive twelve-month terms. This is also
    consistent with all of Ms. Lewis' admissions during the preceding years, which never disputed that
28                                                                                    (Continued...)

16

1  Exhibit C-35. BroadcastUrban, however, argues that the production of the Short Film prevented
2  the Reversion and that as a result in now holds the Rights in perpetuity.

3  The Effect of the Short Film on the Reversion

4        The production of the Short Film before December 21, 2011 did not prevent the Reversion.
5  The Contract is ambiguous about the sort of "initial motion picture" sufficient to prevent the
6  Reversion, *see* Contract at 19, ¶ 13, and the evidence of the parties' negotiations prior to entering
7  into the Contract suggests that they did not mutually intend at the time of contracting that the Short
8  Film would meet that standard. In addition, BroadcastUrban's own conduct after entering into the
9  Contract also impeaches its position that a film of literally any duration or nature constitutes a
10  "motion picture" for all purposes under the Contract.

11        Because the parties plainly intended the Contract to serve as an integrated expression of
12  their agreement, *see* Contract at 6, ¶ 14; 22, ¶ 21(j); 24; and 25, "extrinsic or parol evidence which
13  tends to contradict, vary, add to, or subtract from the terms of the written contract must be
14  excluded. Like most rules, however, the parol evidence rule has its exceptions. For example, when
15  fraud, mistake, or duress is alleged, the admission of parol evidence to vary the express terms of a
16  contract may be proper. Parol evidence may also be admitted to explain ambiguous language in a
17  contract." *Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C. 1983) (internal citations omitted).

18        It is true that the Contract does provide unambiguously that BroadcastUrban may use the
19  Rights, as long as it has them, to make "one or more" motion pictures. Contract at 8, ¶ 1(a).
20  However, it does not necessarily follow that the phrase "the initial motion picture" as used with
21  reference to the Reversion is unambiguous, and that the Reversion may be prevented by the making

22

23
   ─────────────────────────────────
   (...Continued)
24  the option had been properly exercised. *See* the text *supra* and Exhibits C-6 at 3, C-47, C-51 and
25  the negotiations memorialized in Exhibits C-16, C-31, C-32 and C-33.

       After these arbitration proceedings were underway, Ms. Lewis argued that BroadcastUrban had
26  actually never timely exercised its option at all, and thus had never actually acquired the Rights in
   the first place. *See generally* Respondent's Post-Hearing Brief at 25-27. For the reasons stated in
27  the text *supra,* that argument is without merit.

28
                                                17

34016/013/ 1006929v1.2

1 of an "initial motion picture" of any duration, nature or quality whatsoever, whether intended for
2 commercial exhibition or not.

3      BroadcastUrban argues that anything qualifying as a "motion picture" under the Copyright
4 Act would also qualify as "the initial motion picture" necessary to prevent the Reversion, Contract
5 at 19, ¶ 13, so that the production of a single scene or even a few seconds of footage would be
6 sufficient to secure the Rights in perpetuity.[19] It is not at all unambiguous that this is the "plain
7 meaning" of the "language used" in the Contract, *Dyer v. Bilaal*, 893 A.2d 349, 355 (D.C. 2009),
8 and indeed if that is what the parties really intended, they could have made that unambiguous by
9 including "motion picture" among the many terms that they did carefully define elsewhere in the
10 Contract. *See* Contract at 7-8. Instead, the Contract contains multiple provisions which cannot be
11 reconciled with BroadcastUrban's position that it provides unambiguously that the Reversion may
12 be prevented with a short film that is unsuitable and unintended for commercial release.

13      Perhaps most saliently, the Contract limits the exercise of certain of Ms. Lewis' reserved
14 rights until five years "after the first release of the first Picture produced hereunder." Contract at
15 12, ¶ 2(d). It is difficult if not impossible to understand how this limitation upon Ms. Lewis'
16 reserved rights was intended to operate if the Contract was also intended to provide that "the first
17 Picture produced" need never be released at all.[20]

18

19 _____

20 [19] *See* Claimant's Pre-Hearing Brief at 9. The Copyright Act defines a motion picture as any succession of images "impart[ing] an impression of motion," 17 U.S.C. § 101, and thus includes,
21 for example, motion picture advertising trailers as well as the few-second-long animated logos that studios and production companies attach to the beginning of their films. The Arbitrator finds that
22 the Contract does not provide an unambiguous definition, whether express or implied, of the sort of "initial motion picture" sufficient to defeat the Reversion.

23 [20] Mr. Wineberry testified that even at the time that he was negotiating the Contract, BroadcastUrban always intended, but did not specifically disclose, that it might not release its first
24 film based upon the Book: "Pretty much when I started negotiating . . . I knew we were going to make at least one before we did the big one, the feature film." HT at 354:8-16. "We hadn't made a
25 movie, so we didn't want the first movie to be 'the' movie. And so I wanted a chance to really get our legs when it came to making the motion picture." HT at 117:18-22.

26     Given the very substantial variance between the stories told in the Book and the Short Film, it seems unlikely that BroadcastUrban always intended that something like the Short Film would be
27 its "first movie" based upon the Book. *See generally infra*, note 24 and accompanying text.

28

1   BroadcastUrban relies in part upon the fact that, even though the term "motion picture" is
2   not defined in the Contract, the word "Picture" is specifically defined very broadly, to include "any
3   kind of motion picture production" at all, even one without sound. *See* Contract at 11, ¶ 1(j)(iv).
4   However, if that definition of "Picture" was also used to define the otherwise undefined term
5   "motion picture" for purposes of the Reversion, there would be no distinction at all between "the
6   initial motion picture" and "the first Picture produced hereunder." Yet the Contract plainly
7   contemplates that "the first Picture produced hereunder" be released, so if those terms are
8   equivalent it would seem that the Reversion could only be prevented by a motion picture suitable
9   and intended for release.

10   BroadcastUrban effectively conceded ambiguity in these terms during earlier proceedings in
11   this matter, when it sought to enjoin Ms. Lewis from making public statements about its production
12   and about this arbitration. BroadcastUrban relied upon language in the Contract which restricted
13   Ms. Lewis from making any public statements about BroadcastUrban's project "[p]rior to the
14   commencement of principal photography." Contract at 20, ¶ 15. Although the Short Film had
15   been produced months before, BroadcastUrban argued that this restraint was still in effect, and thus
16   that this limitation referred to something other than the Short Film – indeed, to the photography of
17   a then- and now-unproduced motion picture actually suitable and intended for distribution. It is not
18   inherently unreasonable to apply the same interpretation to the clause which prevents the Reversion
19   only upon the production of "the initial motion picture."

20   The Contract also provides that BroadcastUrban is entitled to receive a refund of whatever
21   it paid to exercise the option if the Reversion occurs. *See* Contract at 5, ¶ 9(c). However, since the
22   Contract also provides that nothing at all need be paid to exercise the option until "the
23   commencement of principal photography" on some sort of undefined production, *see* Contract at
24   13, ¶ 5, this also suggests that the parties contemplated that the Reversion might occur even after at
25   least some sort of production was made, and thus that not every possible form of production would
26   by itself be sufficient to defeat the Reversion.

27

28

19

In addition, the Contract limits BroadcastUrban to two twelve-month renewals of the option before it must be exercised or lapse, except that two additional renewal terms of the same length are authorized "to meet the availability and schedules of a director or star actor." Contract at 2, ¶ 3. Especially since no payment is actually required to exercise the option, *see supra* note 7 and accompanying text, this provision would be entirely unnecessary if the Reversion could be defeated and the Rights indefeasibly vested in perpetuity simply by the private production of one or more simple scenes never intended for public exhibition. Instead, this term supports the contractual interpretation urged by Ms. Lewis, to the effect that the Reversion was intended to ensure that BroadcastUrban produced a commercially viable feature film as quickly as possible, and that it lose its Rights to the Book if it failed to do so within a reasonable time.

Finally, the contractual interpretation offered by BroadcastUrban is simply not objectively reasonable. It has for decades been common practice in the entertainment industry and its constituent creative communities to provide a time limit within which rights acquired under an option will revert to the grantor if they have not been exploited both usefully and publicly within a limited period of time. The courts have long recognized that such reversions are not purely economic in nature, but also serve creative and even emotional goals: "[R]eversionary clause[s] [are] designed to ensure that the producer would not subsequently decide to abandon the proposed film, or 'pigeon-hole' the book – a not uncommon occurrence in the motion picture industry – and hence deprive [the grantor] of both his expected share of the proceeds <u>and the satisfaction which may come to an author upon seeing his work take life on the screen</u>. If, pursuant to the clause, a picture was not in fact completed as intended by the parties within the time specified, [the grantor] would, quite properly, then be free to make other arrangements and hence to realize his objectives." *Mailer v. RKO Teleradio Pictures, Inc.*, 332 F.2d 747, 748 (2d Cir. 1964) (emphasis added).

Thus the very essence of a reversionary clause is a hammer with which to force a purchaser of rights to actually create a new work for distribution or to give the rights back to someone who will. In the *Mailer* case cited *supra,* for example, the Second Circuit affirmed the District Court's holding that a motion picture based upon a literary work is only "made" for the purposes of

20

1 defeating a reversion when it is "ready to be processed for distribution to exhibitors. The
2 photography has been completed, the editing has been done and the picture awaits only those
3 technical steps which may be necessary to put it in distribution." *Mailer v. RKO Teleradio*
4 *Pictures, Inc.*, 213 F. Supp. 294, 299 (S.D. N.Y. 1963) (emphasis added).

5      A reversionary clause which could be defeated with the production of a few frames or
6 scenes which are neither suitable nor intended for public exhibition would serve no purpose at all.
7 It would be objectively unreasonable to interpret the Contract in that way – and certainly
8 unreasonable to conclude that this is the *only* way in which the Contract can *possibly* be
9 interpreted. In the end, the Contract is simply not well-drafted[21] and contains sufficient ambiguity
10 to permit extrinsic evidence to be used in its interpretation.[22]

11      The extrinsic evidence of the parties' discussions prior to execution of the Contract shows
12 not only a mutual intention to make a commercial film based upon the Book, but also shows that
13 the making of a high-quality feature film on an accelerated timetable was both parties' primary
14 objective in entering into the Contract. For example, BroadcastUrban's initial presentation to Ms.
15 Lewis told her that "the nation needs to see" her late husband's life story and that it stood "ready to
16 assemble the production team, secure the financing and produce a quality film with your approval

17

18    [21] *See, e.g., supra*, note 5. In addition, the text of the Contract often switches with seeming
randomness to language that suggests inexplicably that only one motion picture will ever be
19 produced at all. *See, e.g.*, Contract at 9, ¶ 1(b), referring to "negotiat[ions] with motion picture or
distribution studios" to contribute to "the financial success of the film," *but see* ¶ 1(c), referring in
20 the next line to "any motion picture produced hereunder." *See also* Contract at 10, ¶ 1(h), referring
to "the motion picture or other versions"; ¶ 1(i), referring to advertising of "the motion picture";
21 Contract at 11, ¶ 2(a), referring to "the promotion of the motion picture."

22    BroadcastUrban also used the definite article during most negotiations about the Reversion, and
in the same message in which it agreed to "make *a* motion picture" within five years, it also
23 mentioned "sources of compensation from *this film*," "advertising or publicizing *the movie*,"
"production of *this film*" and "the financial success of *this film*." Exhibit R-3 (emphasis added).
24 There is nothing in these documents which suggests any intention that the Reversion be defeated by
the production of a film which was neither suitable nor intended for commercial release.

25    [22] Extrinsic evidence is also admissible to evaluate Ms. Lewis' alternative counterclaim for
fraud, to the effect that BroadcastUrban deceived her by concealing an intention to make the
26 Reversion illusory by allowing it to be defeated through the production of an inexpensive short
motion picture neither intended nor suitable for public exhibition. *See* Response to Demand for
27 Arbitration, pp. 13-14, and *see Stamenich, supra*, 462 A.2d at 455.

28

21

1   and support. Our goal is to produce a film you will be proud of on a timetable which coincides
2   with the promotion of Baltimore's new Reginald F. Lewis African-American Heritage Museum."
3   Exhibit R-1 (emphasis added). That museum had been planned since at least 2000, and it opened
4   in 2005. *See* HT at 70:12-18; 696:2-15. BroadcastUrban's presentation also told Ms. Lewis that,
5   "[u]pon the signing of the Option & Literary Purchase Agreement, BroadcastUrban will
6   immediately begin implementing the following services from initial development to final
7   distribution: . . . Negotiating Domestic & International Distribution Rights." Exhibit R-1. That
8   presentation made no mention of any film other than a feature suitable for worldwide release, and
9   solicited the Contract specifically "[t]o insure [sic] the success of this film." *Id.*

10          Even more significantly, the documentary record shows that BroadcastUrban specifically
11  selected the five-year period applicable to the Reversion in order to allow it time to produce a
12  major feature-length film, and that it specifically solicited Ms. Lewis' consent to that reversionary
13  period on that basis. BroadcastUrban told Ms. Lewis' counsel that "[w]e actually need the
14  flexibility of paying Mrs. Lewis for up to 5 years of successive options. Generally it takes an
15  average of about 5 years from the time the rights to a literary work are optioned for a film of this
16  magnitude to raise the financing necessary to produce a quality motion picture. We also need the
17  time to leverage the best possible distribution deal for this film, which means extensive
18  negotiations with Warner, Paramount, Columbia, Disney and other studios." Exhibit R-5
19  (emphasis added). It would be inconsistent with this record to interpret the Reversion in a way that
20  would allow it to be defeated through the production of an "ultra low budget" film of no magnitude
21  which was never intended for distribution.

22          Even after the Contract was executed and the option was exercised, BroadcastUrban never
23  acted as if a production of any nature or quality whatsoever constituted a "motion picture" under
24  the Contract, whether for purposes of the Reversion or for any other purpose. For example,
25  BroadcastUrban spent $3,000 to produce a trailer based upon the Book, which it was using in 2009
26  to interest potential investors in its project. *See* Exhibit C-24 at 17, 18. However, BroadcastUrban
27  never argued that the production of that "Reginald Lewis Story Video Trailer" was sufficient to

28

22

1 defeat the Reversion, nor did it make a second $50,000 payment to Ms. Lewis when it began
2 principal photography on the Short Film, even though the Short Film would, by the definition now
3 urged by BroadcastUrban, be the *second* "motion picture" produced under the Contract. *See, e.g.*,
4 BroadcastUrban's concession that "if we want to make another motion picture, we have to pay her
5 $50,000 again." HT at 102:6-8.

6       For all of these reasons, the production of the Short Film did not defeat the Reversion, and
7 the Rights have now reverted to Ms. Lewis subject to her repaying to BroadcastUrban the $35,000
8 that it paid to exercise its option in the manner set forth later in this Award.

9 <u>Copyright Infringement</u>

10       Ms. Lewis alleged that the Short Film infringes upon her copyright in the Book, *see supra*
11 note 1, but that is not correct and would not be correct even if the Short Film had been created after
12 the Reversion. Both the Book and the Short Film are biographical treatments of the same person,
13 and of course it is well established that "historical facts and events in themselves are not protected
14 by copyright. Because biographical works are basically personal histories, two biographies of an
15 individual will necessarily be similar in content and copyright protection is often denied." *Gardner*
16 *v. Nizer*, 391 F. Supp. 940, 942-43 (S.D. N.Y. 1975), citing *Rosemont Enterprises, Inc. v. Random*
17 *House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009 (1967). *See also Crane*
18 *v. Poetic Products Limited*, 593 F.Supp.2d 585, 590 (S.D. N.Y. 2009), citing *Rosemont* for the
19 proposition that "[o]rdinary historical facts and events are not protectable elements under the
20 Copyright Act." Even "interpretations of historical facts or events are not protectable, 'including
21 theories or plots.'" *Id.*, quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978-79 (2d
22 Cir. 1980).

23       Even when there are protectable elements in a biographical work, "[c]opyright infringement
24 will be found only when there is 'substantial' or 'material' copying, appropriation or taking of the
25 copyrighted work. Indeed, the copying must be even more substantial to constitute infringement
26 when historical works are involved." *Gardner*, 391 F. Supp. at 943, quoting *Alexander v. Irving*

27

28

23

1 | *Trust Co.*, 132 F. Supp. 364 (S.D. N.Y. 1955), *aff'd*, 228 F.2d 221 (2d Cir. 1955), *cert. denied*, 350
2 | U.S. 996 (1956) and *Oxford Book Co. v. College Entrance Book Co.*, 98 F.2d 688 (2d Cir. 1938).

3        In such cases, "to the extent that the disputed works are similar with respect to plot
4 structure, individual scenes, settings, or features of individual characters that reflect historical facts
5 or interpretations, those similarities do not count toward substantial similarity analysis. Rather,
6 substantial similarity must be shown through reference to the creative aspects of these works, such
7 as fictional plot developments, scenes, settings, and character traits. Substantial similarity can also
8 be demonstrated through reference to creative devices that span the protectable and unprotectable
9 elements of the works and transform the atomized facts into a meaningful, fictional story. These
10 devices include pace, theme, and narrative structure." *Effie Film, LLC v. Pomerance*, --- F.Supp.3d
11 ---, 2012 U.S. Dist. LEXIS 179030 (S.D. N.Y. Dec. 18, 2012).

12        The Short Film depicts only a few events in the life of Reginald Lewis, principally his
13 courtship of Loida Nicholas (Lewis), his departure from a major New York law firm to open his
14 own practice, the birth of his first child, his unsuccessful attempt to acquire the Almet furniture
15 company and his successful acquisition of McCall Pattern Co. Even these events are covered only
16 briefly, and the Short Film does not even mention (except in one line of dialogue at the end, and in
17 a short text epilogue) the achievement for which Reginald Lewis was most well known, the
18 successful acquisition and management of TLC Beatrice. By contrast, the Book covers Mr. Lewis'
19 entire life, literally beginning with the day of his birth and ending on the day of his funeral.

20        More importantly for any copyright analysis, the Book and the Short Film present entirely
21 different versions of the basic facts of the events which they do both depict. Thus, even if there
22 was some "thin" copyright protection available for an "original selection or arrangement of facts"
23 in the Book, *Crane*, 593 F.Supp.2d at 590,[23] that selection would not be infringed by the Short Film
24
25

---

26 [23] "[W]hile copyrights do not apply to facts themselves, 'thin' copyright protection does exist
for an original selection or arrangement of facts, 'but the copyright is limited to the particular
selection or arrangement.'" *Crane*, quoting *Feist Publications, Inc. v. Rural Telephone Service*
27 *Co.*, 499 U.S. 340 (1991).

28

24

1 for the simple reason that the Short Film actually presents different facts, or at least depicts the
2 same historical events in very different ways. It does not matter which of these works actually
3 tells the objective historical truth, or whether neither of them does: The historical facts themselves
4 are not protected by copyright, and to the extent that both works present dramatizations or
5 fictionalizations, there is insufficient similarity between them to support a claim of infringement.[24]

6        For example, both the Book and the Short Film depict Loida Nicholas' initial rejection of
7 Reginald Lewis, including a message she sent saying that "I never want to see you again" because
8 of her indignation at Mr. Lewis' expectation of "intimate relations" on their second date. *See* Book
9 at 100; Short Film at 4:20; Exhibit C-12 at 6. However, the Book relates that Mr. Lewis made a
10 calculated decision not to respond immediately because "[h]e knew that sometimes, in order to get
11 something you really want, you have to be willing to wait. This was one of those times." Book at
12 100.

13        The Book then relates that "[t]wo weeks went by before Loida got another call from
14 Lewis." *Id.* The Book then says that during this "call" two weeks later, Mr. Lewis asked for a
15 third date and Ms. Nicholas accepted without knowing at the time whether Mr. Lewis had even

16

17 ──────────────
   [24] Separate and apart from any copyright analysis, this comparison of the Book and the Short
18 Film further supports the conclusion that the Short Film was created solely as a hurried pretext to
   avoid the Reversion. While the Contract did allow BroadcastUrban substantial creative control
19 over the works that it chose to create, *see* Contract at 12, ¶ 3, BroadcastUrban consistently
   represented that its goal was to actually tell Mr. Lewis' story, and not to create a caricature or to
20 publicize a manufactured version of events that never happened. *See, e.g.*, Exhibit R-1. Mr.
   Wineberry also testified, however, that although BroadcastUrban discovered that "maybe the
21 author of the [B]ook did not expound on certain characters and certain events," he did not think that
   anything in the Book was intentionally "false or inaccurate." HT at 811:17-20. It is difficult to
22 reconcile the content of BroadcastUrban's Short Film with the notion that it thought the version of
   events in the Book was accurate, and that it wanted to present a truthful account of Mr. Lewis' life.

23        BroadcastUrban also agreed in the Contract that no portrayal of Mr. Lewis would "be libelous
   or slanderous." Contract at 13, This is yet another example of poor draftsmanship, since "[a]
24 defamation action does not survive the death of either party," *Waldon v. Covington*, 415 A.2d 1070,
   1074 (D.C. 1980), but this may have been intended as a promise that no portrayal of Mr. Lewis
25 would be so false and unflattering that he could have prevailed on such a claim if brought during
   his lifetime. The Arbitrator was not asked to determine whether or not the Short Film complied
26 with this requirement, and no such determination could be made without evidence of the actual
   historical record, *see, e.g., infra* notes 26 and 28, as well as extrinsic evidence of the way in which
27 this restriction was intended to operate.

28

25

34016/013/1006929v1.2

1 received her message at all. According to the Book, it was not until after dinner on this third date,
2 when the couple was strolling through Manhattan, that Ms. Nicholas first inquired about her
3 message and asked Mr. Lewis whether or not he had received it. *See* Book at 101.

4      The Short Films tells an entirely different version of these events, depicting Mr. Lewis
5 working at his desk at the Paul Weiss law firm in New York when he is hand-delivered a note card
6 containing Ms. Nicholas' message. Immediately upon reading the note, Mr. Lewis picks up the
7 telephone to call a florist and order "your finest bouquet." Short Film at 4:45; *see also* Exhibit C-
8 12 at 5-6. Mr. Lewis is then shown on what appears to be the following morning, standing with
9 these flowers behind his back in the lobby of the Cravath, Swaine & Moore law firm, where he
10 plainly expects to find Ms. Nicholas.[25] *See* Short Film at 6:32; Exhibit C-12 at 7-8. Ms. Nicholas
11 is clearly surprised to see Mr. Lewis and has had no previous warning that he was to appear. In
12 contrast to the version of events told in the Book, she asks him immediately whether or not he
13 received her note, *see* Short Film at 6:42; Exhibit C-12 at 8, and he acknowledges that he did
14 before managing to persuade her to accept another date with him.

15      The Book and the Short Film also relate very different versions of the events leading to Mr.
16 Lewis' departure from the Paul Weiss law firm. According to the Book, Mr. Lewis made the
17 decision to leave that firm entirely on his own, reaching the conclusion that "[h]e could never settle
18 for being a faceless Paul Weiss drone no matter how well he was treated or compensated," Book at
19 75, and it says that his colleagues "were surprised when Lewis informed them of this decision" to
20 start his own law firm and that his mentor at Paul Weiss "pulled out all the stops in an attempt to
21 convince him to stay." *Id.* Although the Book does briefly describe a conversation in which "a
22 partner at the firm implied that Lewis might not make partner," it also says that Mr. Lewis reacted

23

24      [25] Although the script for the Short Film sets these events in the morning at Cravath, Swaine &
25 Moore, *see* Exhibit C-12 at 7, neither the Short Film nor the Book explain why Mr. Lewis might
have expected to find Ms. Nicholas at that firm. In the Book, Ms. Nicholas is depicted during this
26 period working as an administrative assistant at the Law Students Civil Rights Research Council,
which it describes as a job with "civil rights organization" that she had found through an
27 advertisement in *The Village Voice. See* Book at 97-98.

28

26

1  "calmly" to this conversation and that this merely "reaffirmed the correctness of his [previous]
2  decision to go out on his own." *Id.*

3         Once again, the Short Film tells an entirely different story. There, Mr. Lewis is shown
4  being summoned to an immediate performance evaluation at Paul Weiss, which the law firm has
5  scheduled with no notice at all. *See* Short Film at 4:09; Exhibit C-12 at 5. During the evaluation,
6  Mr. Lewis says that he wants to be a partner in the firm, *see* Short Film at 5:19, but is told that
7  partnership is "not in the cards." This news is delivered explicitly, formally and officially on
8  behalf of the firm, and in no way resembles the passing "implication" described in the Book in
9  which a lone partner suggests that Mr. Lewis "might" not become a partner. Instead of reacting
10  "calmly," as in the Book, Mr. Lewis becomes angry and says, "You're kidding, right? I've been
11  busting my ass at this firm!" Short Film at 5:30; Exhibit C-12 at 7. In the script, Mr. Lewis also
12  tells the partner evaluating him that "This is bullshit." Exhibit C-12 at 7. Mr. Lewis then gets up
13  to leave while still angry, and is told that walking out of his performance review will be treated "as
14  a letter of resignation." Mr. Lewis continues out the door, telling the partner that he will "walk out
15  of here and be partner at another firm on the first day." Short Film at 5:55; Exhibit C-12 at 7. In
16  the next scene, Mr. Lewis has already opened his own law firm and has been working there for
17  several years.

18         The chronology of these events is also very different in the two works. The Book says that
19  Mr. Lewis and Ms. Nicholas had their first date on December 8, 1968, "[t]he day after [Mr. Lewis']
20  26th birthday," and their third date "around Christmas" a few weeks later. *See* Book at 1, 97, 101.
21  Mr. Lewis had only graduated from Harvard Law School and started working at Paul Weiss during
22  the summer of 1968, *id.* at 72, and so, as the story is told in the Book, he had at the time of his first
23  few dates with Ms. Nicholas been working at that firm for less than five months. According to the
24  Book, Mr. Lewis was still working at Paul Weiss when he and Ms. Nicholas got married on August
25  16, 1969, *see* Book at 106, and he continued working there until at least "the summer of 1970."
26  Book at 74, 76. However, the Short Film sets Mr. Lewis' performance evaluation and constructive
27  resignation from Paul Weiss on the very same day that he received Ms. Nicholas' written message

28

27

1 following their second date – just a few months after the Book says that he started work there and
2 at least eighteen months before it says that he left the firm. *See* Short Film at 4:09; Exhibit C-12
3 at 5.[26]

4     The birth of Mr. Lewis' daughter Leslie is also depicted very differently in the two works.
5 The Book states that "Lewis was in the delivery room when [his daughter] Leslie came into the
6 world." Book at 108. However, the Short Film depicts Mr. Lewis sitting anxiously in a hospital
7 waiting room for a long time, until a physician finally "exits the delivery room" to tell him that "we
8 had to perform an emergency C-Section," a fact which he had obviously not known previously.
9 Short Film at 7:32; Exhibit C-12 at 9.

10     The Book and the Short Film likewise tell completely different versions of the events
11 surrounding the collapse of Mr. Lewis' attempt to acquire the Almet furniture company. Both
12 works agree that Mr. Lewis and Almet's owner, Bill Cammer, reached a fully-negotiated deal
13 under which Mr. Lewis would acquire the company, but that the deal was never signed. However,
14 according to the Short Film, the deal collapsed because Mr. Cammer was a racist who was not
15 aware that Mr. Lewis was African-American until he met Mr. Lewis for the first time at a meeting
16 to sign the final acquisition documents. As the story is told in the Short Film, Mr. Cammer arrives
17 first and is upbeat and eager to sign the papers, telling his attorney that he has grown fond of Mr.
18 Lewis during their telephone conversations: "He calls every day. It's true what they say about
19 these Harvard fellas. He knows how to court a deal. I like his tenacity." Short Film at 11:31;
20 Exhibit C-12 at 11-12. When Mr. Lewis' white colleague Charles Clarkson enters the room, Mr.
21 Cammer assumes that he is Mr. Lewis and greets him warmly, saying that "it's nice to put a face
22 with the name." Short Film at 11:45; Exhibit C-12 at 12. When he realizes his mistake and sees
23 that Mr. Lewis is in fact African-American, Mr. Cammer is "stunned" and announces immediately
24 that the deal is off, saying that he "thought he was dealing with someone else" and that he will not

25

26     [26] As a matter of actual historical fact, Mr. Lewis was not licensed to practice law in the State
of New York until July 7, 1970, a date which appears somewhat inconsistent with (or at least
27 unexplained by) both the story told in the Book and the events depicted in the Short Film.

28

28

1  permit his employees to work for "some street hustler." Short Film at 13:05; Exhibit C-12 at 13.
2  Mr. Lewis becomes enraged and lunges at Mr. Cammer, who leans in once Mr. Lewis has been
3  restrained and whispers to him in a smug and unmistakably racist tone that "[y]ou shouldn't even
4  be in this room." Short Film at 13:35; Exhibit C-12 at 13.

5          The story told in the Book bears no resemblance to this at all. According to the Book, Mr.
6  Lewis was not even present at this meeting between Mr. Clarkson and Mr. Cammer, which it says
7  took place in Los Angeles while Mr. Lewis was participating by speakerphone from New York.
8  *See* Book at 115. Furthermore, according to the Book, Mr. Cammer had announced well before the
9  meeting that he would refuse to sign the documents necessary to close the transaction. Although
10  the Book makes clear that Mr. Lewis was acutely aware of the bigotry and prejudice that he and
11  other African-Americans encountered during his lifetime, *id.* at 87-90, it nowhere suggests that Mr.
12  Lewis thought racism to be a factor in Mr. Cammer's decision and to the contrary reports instead
13  that "[a] short time after rebuffing Lewis, Cammer sold Almet to a Baltimore company for about
14  $11 million, instead of the $7 million Lewis offered him." Book at 117. According to the Book,
15  Mr. Lewis believed that Mr. Cammer backed out of the deal because Mr. Lewis had "educated
16  him" about the true value of the company, and that although Ms. Lewis thought that racism was a
17  factor, "I never verbalized that to my husband."[27] *Id.*

18          The Short Film also presents a different version of the events leading up to Mr. Lewis'
19  acquisition of McCall Pattern Co. In the film, Mr. Lewis is shown sitting at a conference table with
20  a character named "Don Smilow," with whom Mr. Lewis has pre-negotiated a sales price of $22.5
21  million. Mr. Smilow suddenly announces that this price is insufficient and asks for $30 million
22  instead, saying in a condescending tone that Mr. Lewis failed "to understand that a discussion is not
23  a deal." Short Film at 21:48; Exhibit C-12 at 21. Mr. Lewis responds by orchestrating a charade
24  which tricks Mr. Smilow into thinking that the investor group he is pretending to represent has

25

26  [27] By contrast, the Short Film depicts Mr. Lewis telling his partners that he blames the collapse
    of the Almet deal on Mr. Cammer's "personal bias" and "personal shit." Short Film at 20:40;
27  Exhibit C-12 at 20.

28

29

1  walked away from the deal. Mr. Smilow quickly panics, apologies for the misunderstanding and
2  signs the documents necessary to sell the company for Mr. Lewis' original price. Short Film at
3  24:04; Exhibit C-12 at 22-23.

4        The Book says nothing of this, and identifies the person negotiating the sale of McCall
5  Pattern Co. as Joel (not Don) Smilow, who worked for Esmark, Inc. as head of the Playtex brand
6  which it had acquired from Norton Simon International. *See* Book at 132-33, 135. In the Book,
7  this Mr. Smilow rejects a $20 million offer from Mr. Lewis for the company, and Mr. Lewis then
8  works for several months to find more financing and improve his offer to $22.5 million, which is
9  accepted and then professionally documented during a four-day period. *See* Book at 147-156.

10       Finally, the Short Film tells a different version of the crucial moment when Mr. Lewis was
11  introduced to Beatrice Foods. In the Short Film, Mr. Lewis has never heard of Beatrice until he
12  receives a telephone call from Michael Milken after Mr. Lewis has sold McCall Pattern Co., when
13  Mr. Milken reads of the sale in the newspaper and calls that morning specifically to tell Mr. Lewis
14  that Beatrice should be his "next acquisition." Short Film at 27:38. In the Book, by contrast, Mr.
15  Lewis learns that Beatrice is for sale from a representative of Bear Stearns, during a luncheon in
16  New York two weeks before the closing of the McCall Pattern sale. *See* Book at 187.

17       The result here is the same as in the very recent and scholarly *Effie Film* decision: "On
18  careful examination, none of these scenes is substantially similar across the two works, particularly
19  when historical facts are filtered out." *Effie Film, supra,* --- F.Supp.3d ---, 2012 U.S. Dist. LEXIS
20  179030 (S.D. N.Y. Dec. 18, 2012). Thus the Short Film does not infringe the copyright in the
21  Book, and would not infringe that copyright no matter when it was created, or whether the creator
22  of the Short Film had any rights to the Book at all.

23       More significantly, Ms. Lewis cannot use the copyright in the Book, or the Reversion of the
24  Rights granted in the Contract, to broadly prevent BroadcastUrban or anyone else from making a
25  motion picture or other creative work about the life of Reginald Lewis, or from using the Book as a
26  historical resource for such a work (although the actual title of the Book may of course be protected
27  by trademark law). "[B]iographies, of course, are fundamentally personal histories and it is both

28

                                        30

1 reasonable and customary for biographers to refer to and utilize earlier works dealing with the
2 subject of the work and occasionally to quote directly from such works." *Maxtone-Graham v.*
3 *Burtchaell, 803 F.2d 1253, 1263,* quoting *Rosemont,* 366 F.2d at 307. A writer's reference to such
4 previous works in the creation of new biographical works about the same subject, and even certain
5 use of the subject's own previously-published words in a new biographical work, is generally
6 considered to be "fair use" under the Copyright Act. *See, e.g. New Era Publications International*
7 *v. Carol Publishing Group,* 904 F.2d 152, 157 (2d Cir. 1990).[28]

8      Since the Reversion has occurred, the "thin" but "not anorexic" copyright protection
9 provided to the Book, *Key Publications, Inc. v. Chinatown Today Pub. Enterprises, Inc.*, 945 F.2d
10 509, 514 (2d Cir. 1991) allows Ms. Lewis to prevent BroadcastUrban and others from copying
11 "fictional plot developments, scenes, settings, and character traits" set out in the Book, *Effie Film,*
12 but since the Book is presented as a well-researched work of history it is not clear if it contains any
13 such fictionalizations at all.[29] Likewise, the copyright also allows Ms. Lewis to prevent
14 BroadcastUrban and others from copying the Book's protectable "pace, theme, and narrative
15 structure," *id.*, but the Short Film, at least, does not do that. A future work might conceivably do
16 so, but that evaluation would require "a careful parsing of protectable fictionalizations from
17

18     [28] Of course the Book is hardly the only source or copyrighted work about the life of Reginald
Lewis. *See, e.g.*, Hart, "Reginald F. Lewis Before TLC Beatrice: The Young Man Before The
19 Billion-Dollar Empire" (LHA Publishing Company 2012). *See also* Pierce, "Keep Going No
Matter What: The Reginald F. Lewis Legacy 20 Years Later" (Bookmark Publishing Corp. 2012),
20 which contains a Forward by the Respondent.

21     Mr. Lewis' business affairs were also the subject of extensive public litigation. *See, e.g.,*
*Carlton Investments v. TLC Beatrice Int'l Holdings*, 1997 Del. Ch. LEXIS 86 (Del. Ch. May 30,
22 1997), approving a payment of more than $13 million to the shareholders of TLC Beatrice to settle
derivative claims that Mr. Lewis during his lifetime "breached his fiduciary duties to the company,
23 committed corporate waste, and/or fraudulently concealed information, such as his own self-interest."

24     [29] "When a book presents itself as an 'account of actual events,' this representation 'renders
proof of infringement more difficult, because copyright protection in this circuit [and others] does
25 not extend to facts or to true events, even if they are discovered through original research." *Effie
Films, supra*, citing *Friedman v. ITC Int'l Television Corp.*, 644 F. Supp. 46, 48 (E.D. N.Y. 1986).
26 As noted *supra*, the Book recites that care was taken to "ensur[e] that events were accurate" and
that "the nuances of [Mr. Lewis'] personality" were correctly portrayed. *See* Book (Forward). *But*
27 *see also supra*, note 26.

28

31

unprotectable interpretations, since both involve the elaboration of meaning in a past that lacks an internal narrative structure or self-determined meaning." *Id.* Even significant "similarities in plot and plot structure [will] not support a finding of infringement [if] these plot elements map onto historical facts. Only where the works depart from actual history, or employ such creative devices as theme and pacing to infuse the work with different literary import, is copyright protection implicated." *Id.*

Prevailing Party

The Contract provides that the prevailing party to any arbitration arising under it "shall be entitled to recover its reasonable attorneys' fees and expenses." Contract at 6, ¶ 13. Ms. Lewis has prevailed on the main claims arising under the Contract – that is, she has defeated BroadcastUrban's claim that the Short Film prevented the Reversion and indefeasibly vested the Rights with BroadcastUrban in perpetuity, and she has to the contrary established that the Reversion did in fact occur. Ms. Lewis has also prevailed on the tort claims that BroadcastUrban alleged against her. However, Ms. Lewis' has not prevailed on her claim for copyright infringement, *see supra*, note 1, and the Copyright Act authorizes but does not require the recovery of attorneys' fees to a party prevailing under that statute. *See* 17 U.S.C. § 505.

Under the law of the District of Columbia, "the grant or denial of attorneys' fees is entrusted to the sound discretion of the trial judge." *BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 996 (D.C. 2009). *See also* IFTA Rule 14.1, providing that "[t]he Arbitrator may allocate the costs of the arbitration [including attorneys' fees] in the award." (Emphasis added.)

The Arbitrator finds that Ms. Lewis is the prevailing party in this proceeding and is entitled to recover a portion, but not all, of her reasonable attorneys' fees and expenses. After further evidence and argument from the parties, the Arbitrator will make an appropriate allocation and award of the fees and expenses to which Ms. Lewis is entitled. That allocation will take into account, among other things, (a) the clarity and extent of Ms. Lewis' success on the contract and tort claims; (b) the clarity and extent of BroadcastUrban's success on the copyright claims; (c) the resources devoted to the litigation of each party's claims and defenses and the extent to which they,

32

and other positions taken before the Arbitration Hearing, increased the expense associated with this matter; (d) the extra expenses, if any, associated with the withdrawal and re-appearance of BroadcastUrban's counsel, and BroadcastUrban's belated production of documents, on the eve of the Arbitration Hearing, *see supra* note 2; (e) the principles set forth in IFTA Rule 14; and (f) any other evidence or legal issues which the parties wish to present.

## INTERIM AWARD

For all of the reasons set forth herein:

1. The Rights licensed to BroadcastUrban in the parties' Contract have reverted to Ms. Lewis. BroadcastUrban is accordingly entitled to a return of the $35,000 that it paid to exercise its option and will in any Final Award receive a credit in that amount toward the amount of attorneys' fees and costs otherwise determined to be due to Ms. Lewis.

2. The Short Film produced by BroadcastUrban does not infringe Ms. Lewis' copyright in the Book, and as set forth in greater detail in the text of this Award that copyright does not as a general matter prevent BroadcastUrban or anyone else from creating a motion picture or other creative work based upon the life of Reginald F. Lewis, or from using the Book as a historical resource in the creation of such a work.

3. With regard to the recovery of legal fees and expenses:

    a. On or before February 15, 2013, Ms. Lewis shall submit a motion supported by competent evidence, setting forth the nature and amount of the legal fees and expenses that she seeks to recover in connection with this proceeding, as well as the basis of that calculation and any associated argument consistent with this Interim Award and the governing law.

    b. On or before March 1, 2013, BroadcastUrban shall submit any opposition or response to Ms. Lewis' motion.

33

1          c.   The parties may if they wish stipulate to, or apply to the Arbitrator for, a

2               different schedule or means to brief and determine these issues.

3    Done at Los Angeles, California USA on January 14, 2013.

4

5                                            Michael L. Novicoff, Sole Arbitrator
6                                            Independent Film and Television Alliance

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    34